**Sharon HOFFMAN, Trudie Matthews, Diane Hoefling, Rev. Ronnie Wallace, and Rev. John Bradley, Plaintiffs,**

**v.**

**James B. HUNT, and The State of North Carolina, Defendants,**

**The United States of America, Intervenor.**

No. 3:93–CV–393–P.

United States District Court, W.D. North Carolina, Charlotte Division.

April 1, 1996.

As Amended April 17, 1996.

---

Raymond A. Warren, Charlotte, NC, for plaintiffs.

Benjamin W. Bull, American Center for Law and Justice, Phoenix, AZ.

Samuel A. Wilson III, W. David Thurman, Bush, Thurman & Wilson, P.A., Charlotte, NC.

David F. Hoke, N.C. Department of Justice, Raleigh, NC, Ann Reed, NC Department of Justice, Raleigh, NC, for defendants.

James M. Sullivan, U.S. Attorney's Office, Charlotte, NC, Neil H. Koslowe, U.S. Dept. of Justice, Civil Division, Washington, DC, for Intervenor.

## AMENDED * MEMORANDUM OF DECISION & ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on Plaintiffs' Complaint, filed December 6, 1993, praying for a Declaratory Judgment, a temporary restraining order, and a preliminary injunction (document # 1).

## I. *PROCEDURAL BACKGROUND*

The Plaintiffs' Complaint challenged the constitutionality of N.C.G.S. § 14–277.4, a statute which criminalizes certain forms of civil protest at health care facilities.

On December 29, 1993, Defendants filed Motions to Dismiss for Plaintiff's lack of standing, failure to state a claim, lack of subject matter jurisdiction, and alternatively, to abstain (document # 11). After oral argument was had on January 14, 1994, the Court in *Hoffman v. Hunt,* 845 F.Supp. 340 (W.D.N.C.1994), denied the Plaintiffs' application for a temporary restraining order and preliminary injunction. The Court determined that declaratory relief was more appropriate than preliminary injunction because it involved the most minimal intrusion possible into the State's constitutionally recognized province of enforcing the criminal law, and ordered Defendants to file their answers, which they did on March 4, 1994 (document # 19). The Court, in that Order, also denied the State Defendants' Rule 12(b)(6) Motions, and preliminarily found the statute overbroad and vague. The Court further found that the Plaintiffs had constitutional standing and stated a claim. The Court found that Section 14–277.4 has a deterrent effect on Plaintiffs' free exercise of their First Amendment rights produced by fear of prosecution for violating the statute. The Court further found that the Plaintiffs have a personal stake in this action because they are persons who wish to freely protest abortions and educate others to their views. The Court further held that the Plaintiffs suffered actual harm because of a credible threat of prosecution. Plaintiffs' complaint makes clear they would be conducting the First Amendment activity but for the genuine threat of enforcement of the disputed state statute by asserting their own rights to free speech. The Court declined to abstain because there is ambiguity of state law that gives rise to injuries of constitutional proportions and because the Court should rule so as to alleviate any concern about the Plaintiffs' infringement of state law.

On May 26, 1994, the President of the United States signed into law the Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), Pub.L. No. 103–259, 108 Stat. 694, codified as 18 U.S.C. § 248. Section

---

* This amendment hopefully corrects any punctuation, typographical, and spelling errors found after filing the original Memorandum of Decision on April 1, 1996. It does not alter in any respect, including without limitation, the Court's opinion or citations, except as to form.

248(c)(3) of that Act authorized action by the State Attorney General in the name of the State.

Consequently, on June 15, 1994, Plaintiffs moved for leave to file an amended complaint to add a new cause of action challenging the constitutionality of FACE because of the additional fear from the threat of enforcement of FACE by Defendant State of North Carolina and the Attorney General of the United States (See Motion to Amend (document # 31) and Amended Complaint (document # 35) and Michael Matthews' Affidavit (document # 68)). Leave was granted by this Court on July 13, 1994 (document # 34) and the amended complaint was filed July 19, 1994 (document # 35). The Plaintiffs' Motion for Preliminary Injunction was filed July 28, 1994 (document # 36) and will be ruled on in this Order.

On August 10, 1994, the State Defendants filed a "Motion to Hold Plaintiffs' Motion for Injunctive Relief in Abeyance" (document # 47) pending resolution of the issues in *American Life League, et al. v. Reno, et al.* which at that time was pending before the Fourth Circuit Court of Appeals. (That case was decided by the Fourth Circuit on February 13, 1995, and is reported at 47 F.3d 642 (4th Cir.1995)). The petition for *certiorari* was denied by the Supreme Court on October 2, 1995.

On August 25, 1994, the United States of America filed a Motion to Intervene and a Motion to Stay ruling on Preliminary Injunction pending decision in *American Life League, et al. v. Reno* (document # 49). On October 5, 1994 this Court granted the United States' Motion to Intervene as a defendant (document # 55), and on November 29, 1994 this Court filed an Order granting the United States' Motion to Stay Plaintiffs' Motion for Preliminary Injunction pending resolution of *American Life League, et al. v. Reno* (document # 60). The Order granting the Motion to Stay was vacated by Order filed October 17, 1995, and the parties were directed to file briefs by November 17, 1995 as to the effect, if any, of the decision in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) upon Congress' authority to enact FACE on the grounds that it rationally concluded that the regulated activity affects interstate commerce (document # 70).

On March 6, 1995, the State Defendants moved to dismiss the Plaintiffs' Complaint regarding FACE and for summary judgment in their favor regarding N.C.G.S. § 14–277.4 pursuant to Rule 56 of the Federal Rules of Civil Procedure (document # 61). An evidentiary hearing was held as to the State statute on February 2, 1996.

The matters now before the Court and to be decided in this Order are:

1. Declaratory Judgment as to the constitutionality of N.C.G.S. § 14–277.4;

2. Declaratory Judgment as to the constitutionality of 18 U.S.C. § 248;

3. The outstanding Motion (document # 61–1) by the State Defendants to Dismiss the Plaintiffs' Complaint as to FACE and the State Defendants' Motion for Summary Judgment (document # 61–2) in their favor as to N.C.G.S. § 14–277.4;

4. Motion by the United States (document # 72) to Dismiss the claim in Plaintiffs' amended complaint challenging the constitutionality of 18 U.S.C. § 248; and

5. Plaintiffs' prayer for a permanent injunction against enforcement of N.C.G.S. § 14–277.4 and 18 U.S.C. § 248.

The Court notes that the Plaintiffs filed affidavits to support their position, but the Defendants did not file any affidavits or produce any evidence at the evidentiary hearing. Because the Court has not excluded Plaintiffs' affidavits and has held an evidentiary hearing, the Court will consider the Plaintiffs' affidavits and the evidence produced by the Plaintiffs at the evidentiary hearing and will treat the Motion to Dismiss as a Motion for Summary Judgment, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. This Court will dispose of the Motion as provided in Rule 56.

In this Court's opinion in *Hoffman v. Hunt,* 845 F.Supp. 340 (W.D.N.C.1994) the Court denied the State Defendants' Motion

to Dismiss for failure to state a claim under Rule 12(b)(6) and found that the complaint stated a claim for a first amendment overbreadth challenge sufficient to overcome a motion to dismiss. The Court also preliminarily found the statute sufficiently vague to overcome a motion to dismiss for failure to state a claim and consequently denied that motion, as well as the Defendants' motions to abstain and to dismiss for lack of subject matter jurisdiction. In the same opinion the Court denied Plaintiffs' application for a temporary restraining order and a preliminary injunction and ordered the Defendants to file their answer as required by Rule 12(a) of the Federal Rules of Civil Procedure.

## II. *NORTH CAROLINA GENERAL STATUTE SECTION 14–277.4*

### A. *The Evidence of Application of N.C.G.S. § 14–277.4.*

The undisputed evidence of this case shows that Plaintiffs Sharon Hoffman, Trudie Matthews, Diane Hoefling, the Rev. Ronnie Wallace, and the Reverend John Bradley are opposed to abortion for religious, moral, and scientific reasons.[1] By reason of that opposition, the Plaintiffs have frequently exercised their First Amendment right to protest in front of health care facilities that perform abortions. During these protests, police officers for the City of Charlotte have relied upon North Carolina's law governing the obstruction of health care facilities to regulate the Plaintiffs' activities as set forth below.

The Plaintiffs' affidavits describe how picketers have been threatened with arrest. Michael Matthews affirms that on February 11, 1995, he was threatened with arrest for distributing literature at an abortion clinic because the police officer on duty interpreted the state statute as prohibiting those activities. He further affirms that on March 18, 1995 he was advised by police officers picketers could not preach or counsel while there was pro-life picketing occurring, and that to avoid arrest the picketers were required to put down their picket signs while others con-

tinued to preach and counsel. (See pp. 1 & 2 of Matthews Aff.) (document # 68).

The affidavits describe confusion about the meaning of the statute among the police. Karen Graham's affidavit (document # 67) affirms that she has personally been at the location of abortion facilities in the Charlotte–Mecklenburg area on approximately 15 different occasions and has encountered the Charlotte–Mecklenburg Police Department who are routinely called to the scene. She further affirms that there are four main abortion facilities in the Charlotte–Mecklenburg area, and that each one is in a different police district of the Charlotte–Mecklenburg Police Department ("CMPD"). It has been her experience that the interpretation and application of the North Carolina law prohibiting the obstruction of access to health clinics is different in each of the four police districts, that the officers in each of the four districts have a different interpretation of the meaning of the words "interfere," "delay," "impede," "obstruct," and "intimidate" depending on the particular sergeant on duty, that there are differences of interpretation within each individual police district, and that it is common for two or three police officers at the scene of a peaceful pro-life picket on public property outside an abortion facility to disagree among themselves on what expressive activities constitute "interference," "delay," "obstruction," "intimidation," or "impeding" under the statutes. She further affirms the police officers will "huddle" like referees in a football game and debate among themselves on what expressive activities will be permitted that day under those words.

Graham's affidavit further says that sidewalks open for public use are adjacent to each of the four abortion facilities in Charlotte. Graham then elucidates a sampling of how various policemen interpret the statute differently concerning picketing on those sidewalks:

 a. Some police officers enforce the North Carolina statute by prohibiting picketers from walking on any portion of a

---

1. On February 2, 1996, this Court held an evidentiary hearing to take evidence concerning the application of North Carolina's statute to the protest activities at issue. At that hearing, the State entered no evidence, and did not contest the testimony of the Plaintiffs concerning the application of North Carolina's law.

public sidewalk crossed by a driveway to the clinic, even if no cars are in sight. She affirms that the police officers interpret the statute as requiring that all picketing occur either on one side or the other of a driveway, and that the mere act of a lone picketer traversing on a public sidewalk from one side to the other of the driveway constituted "interference," "delay," "impeding," and "obstructing." No actual impediment of vehicular or pedestrian traffic is required to have occurred.

b. Other police officers interpret the North Carolina statute as permitting crossing the driveway on the public walkway so long as the picketer does not actually block vehicular traffic, but that they change their mind from day to day or even on the same day.

c. Some police officers interpret the North Carolina statute as permitting pro-life leafletters to stand on the public sidewalk to the side of the driveway and wave their literature to get the attention of persons in automobiles entering or exiting the driveway area, so long as the leafletter does not step in front of an automobile.

d. Other police officers interpret the North Carolina statute as prohibiting standing on the public sidewalk to the side of the driveway and waving pro-life literature because if a car stopped so that the person inside could obtain the literature it would constitute interference under the statute.

e. Another officer told the affiant that the only time she could hand out literature was after the automobile was parked in the clinic parking lot, and then advised the affiant that if she walked to the parked automobile she would be trespassing on abortion facility property.

f. On one occasion, a police sergeant pretended to draw an imaginary "line" on the sidewalk and stated that if the picketers crossed the "line," it would violate North Carolina law.

g. On another day, police officers at the scene advised pro-life picketers who were also offering counseling that they could either picket or sidewalk counsel, but could not do both simultaneously under the North Carolina statute, as to do both would constitute "interference" under the North Carolina statute.

The affidavits describe how interpretation of the statute has been influenced by the opinion of clinic employees. Graham states that on Saturday, June 11, 1994, approximately 30 people arrived at 212 E. Morehead Street to picket and distribute literature at "Family Reproductive Health Clinic" which performs abortions. Graham affirms that while picketing they walked peacefully in a single file and crossed the driveway on the sidewalk, but never stood in front of a car. As a car pulled into the driveway they did not place any objects in front of the windshield but would lean toward a car if it slowed or stopped and allowed the passenger to hold out a hand and accept literature. Graham further affirms that after cars were in the parking lot a person in the pro-life group would use a megaphone to speak to them. The megaphone was not battery operated and did not electronically amplify sound. Graham affirms that Officer Helms told them they could not hand out literature at the driveway, but only in the clinic parking lot. After Graham questioned Officer Helms about coming into the parking lot, the officer asked a Ms. Ross from the clinic if that would be okay and she said "no." Ms. Ross then told the officer that the statute prohibited protestors from handing out literature to women entering the clinic. As Ms. Ross put it, "All they can do is when the women drive in here [the clinic parking lot], I'll ask them if they want to talk [to the protestors] and if they do, then I'll tell them that they can go down there." After the police officer heard Ms. Ross' opinion as to the operation of North Carolina's statute, he turned to Ms. Graham and said, "Well, I guess that's all you can do is yell out at them." (Tr. p. 28, lines 19–25; p. 29, lines 1–14). Graham then told the officer they were going to attempt to hand out the literature peacefully and that they understood they would be arrested. Officer Helms then called her supervisor, Sgt.

Neal, who stated that picketers crossing the driveway on the sidewalk was a violation of the North Carolina statute because it blocked the driveway. Sgt. Neal also complained about people handing out literature on the sidewalk next to the driveway, and he stated that if a car stopped, the picketers would be in violation of North Carolina law because the car would be blocking the driveway. Later the officers told the picketers that they could not cross the driveway, but had to divide into two groups, one on each side of the driveway (Graham Aff. document #67). Graham also informed Sgt. Neal that the picketers would continue to hand out literature and as long as they did not stand in the car's path or force literature on anyone who did not want it and that they would offer literature to any car that slowed or stopped.

On November 7, 1995, the Court set an evidentiary hearing for January 8, 1996 to hear testimony and take any other relevant evidence concerning the Defendants' application of N.C.G.S. § 14–277.4 to protest activities of the Plaintiffs. (Doc. #71). Because of adverse weather conditions the hearing was rescheduled to February 2, 1996. At the hearing the Plaintiffs offered Karen Graham, Diana Hoefling, Reverend Ronnie Wallace, and Michael Alan Matthews, and Trudie Matthews, all of whom testified in substance that they were opposed to abortion and that the picketing of abortion clinics had as its purpose to talk to women who are seeking abortion and to convince them not to participate in that procedure through persuasion by showing them literature, pictures and through discussion.

All of the witnesses testified that they had never engaged in violence or threats of violence to achieve the goals of delaying a person from having an abortion or changing the mind of someone seeking an abortion (Tr. p. 9, lines 12–17; p. 42, lines 12–14; p. 58, lines 3–7; p. 79, lines 4–25; p. 80, lines 1–7).

All of the witnesses testified that they had experienced difficulty in having the police define exactly what was and what was not a violation of the statute. Likewise, all of the witnesses recounted examples where the personnel of clinics providing abortions had goaded the police into changing their interpretation of the statute. (Tr. p. 24, lines 16–25; p. 25, lines 1–6; p. 28, lines 22–25; p. 29, lines 1–14; p. 45, lines 1–9; p. 61, lines 3–16). For example, Ms. Graham testified:

A. Well, there are occasions when police officers say that handing out that literature is in violation of the statute. There was even one occasion when a woman police officer came to the scene, and she talked to the abortion clinic administrator, then came and talked to me and said that there were people who were coming into the clinic for other reasons than abortions, and they were there to have abortions, which is perfectly legal, and that just our presence there was causing them to call in and say that the were going to delay their appointments, and, therefore, that was in violation of the statute and she had every right to arrest me just for that.

(Tr. p. 15, line 25; p. 16; lines 1–12). Police officers told Karen Graham that if a car stops to receive literature then they would be delayed and that would be in violation of the statute. (Tr. p. 18, lines 3–9). Police drew imaginary lines on the public sidewalk and told Graham that she would have to stand behind the line and could not cross it to hand literature to a car which had stopped in the driveway crossing the sidewalk to get the literature to the car. (Tr. p. 19, lines 10–21).

On June 11, 1994, after the Clinic Administrator complained to the police that the demonstrators should have been arrested because they had violated the statute, the police stopped three of them, took their telephone numbers and where they worked and told them a warrant may be issued for their arrest. (Tr. pp. 24–25). All of the witnesses testified that as a result of this threat they spent the ensuing weeks in constant fear of arrest and repeatedly called the Police Department to try and learn if they were going to be prosecuted. When Ms. Graham called the Police Department to find out if she would be prosecuted, she was told that the police were still trying to decide if the protestors had violated the statute. (Tr. p. 24, lines 16–25; p. 25, lines 1–17).

On the following Saturday, a police officer told the protestors that if they violated the statute he would have them arrested. When

Graham asked what his interpretation of the statute was so that she would know how not to violate it, the officer responded that she would know when he arrested her. When she told the officer that every officer who came out told her something different and asked him to tell her what she could do not to be arrested, he said "you can stay home." (Tr. p. 25, lines 18–25; p. 26, lines 3–22).

There were occasions when clinic "escorts" physically blocked Ms. Graham on public property from handing out leaflets to persons who indicated they wanted to receive them. (Tr. p. 30, lines 2–6). Ms. Graham testified that every time she went out to an abortion clinic she was threatened with arrest and was told most of the time she couldn't hand out her literature and couldn't persuade people not to have an abortion. (Tr. p. 35, lines 17–25).

Ms. Diane Hoefling testified that the goal of her expressive activities was to delay women going into an abortion clinic so that she could "get them to realize their child is alive and that abortion is killing." (Tr. p. 44, lines 2–8).

The Reverend Ronnie Wallace testified that he was opposed to abortion and was categorically opposed to violence or threats of violence to carry out those goals which were to persuade people entering a facility to delay or change their minds about destroying a child. (Tr. pp. 57–58). According to Wallace, the enforcement of the statute depends upon the content of the message he preaches outside of the clinics and the degree to which clinic personnel goad the police. He testified that when he preaches against abortion in general moral terms clinic personnel don't really object and there is no real problem. But when he speaks out about the racist and genocidal motives behind abortion or the malpractice record of the doctor performing the abortions, clinic personnel "go ballistic" and call the police. On several occasions police told Wallace that he could not preach on the sidewalk, but instead, he had to keep moving. Wallace was forced to keep parading back and forth of the clinic with one police officer in front of him and one police officer behind him. (Tr. p. 61, lines 3–25). The police told Wallace that by preaching he was interfering with people driving into the clinic and that kneeling to pray on the grassy knoll between the street and the sidewalk was "escalating the situation." (Tr. pp. 63–64). Wallace was forced to keep parading back in forth of the clinic with one police officer in front of him and one police officer behind him.

The witnesses testified that they opposed abortion on moral and religious grounds. Michael Alan Matthews testified that he believed "abortion is the taking of a human life and that it is an abomination to God." (Tr. p. 69). Trudie Matthews testified abortion is murder and the killing of unborn babies. (Tr. p. 88, lines 1–5).

The witnesses testified to a real fear of arrest. One Sgt. Whitt Neal of the Charlotte Police Department on one occasion told the police officers that he had enough handcuffs for all of them and to line them up and he would arrest them. (Tr. p. 85). Graham testified as to the effect this had on the group as follows:

A: Well, the group that remained there, we thought for sure that we were going to be arrested, and at that time, I started pleading with Sergeant Neal. I said, "Please don't arrest us, we didn't come here to get arrested." He said, "You came here to test the law, and that's what we're going to do here, you pick the ones you want arrested, I'll just get you arrested." And I said, "No, sir, we don't want to be arrested, we came out here just to distribute our literature, please let us clear this up, let me call the captain on Monday morning, please don't arrest us." And he finally had conversation with some of the other officers and decided not to arrest us but just take the names of the three of us.

(Tr. p. 85, lines 16–25; p. 86, lines 1–13).

There is no evidence that any of the protestors, including the Plaintiffs, in any way engaged in anything more than speech which did not involve threats, force, obstruction, or physical impediment. Rather, the evidence reveals mere leafletting to impede and interfere with abortion through peaceful persuasion. (Matthews Aff. ¶ 2, Graham Aff. ¶ 3, Tr. p. 9, lines 12–14; p. 44, lines 1–12; p. 57,

lines 7–25; p. 28, lines 1–7; p. 42, lines 12–14).

The Plaintiffs are aware that Congress has enacted a federal statute that regulates their protest activities. They fear that the federal statute makes them liable for criminal and civil prosecution and damages because of their protest activities because they have been threatened with arrest under the statute. (Graham Aff. ¶ 5; Matthews Aff. ¶¶ 2, 4).

The Court finds the evidence produced by the Plaintiffs to be true and unrefuted, since the Defendants have not filed any affidavits nor produced any witnesses to contradict the affidavits or testimony.

## B. *Findings of Fact.*

Based on the affidavits filed by the Plaintiffs and the testimony provided at the evidentiary hearing on February 2, 1996, the Court makes the following findings of facts:

1. The Plaintiffs are citizens who believe abortion is the taking of innocent human life, the sacrifice of human life, killing, or the taking of human life (Tr. p. 6, lines 18–20; p. 44, lines 2–8; p. 57, lines 5–6; p. 69, lines 16–17; p. 88, lines 1–5; p. 42, lines 5–11).

2. The Plaintiffs and other protestors have engaged in leafletting, picketing in accordance with city ordinances, sidewalk counseling and other non-violent activities to persuade women going into an abortion clinic so that they could get them to realize their child is alive and that abortion is killing (Tr. p. 6, lines 16–20; p. 17, lines 21–25; p. 18, lines 1–16; p. 42, lines 5–11; p. 88, lines 1–5).

3. The ultimate goal of the Plaintiffs is to end abortion in the United States by peacefully persuading women to seek alternatives to abortion such as adoption and to persuade physicians to discontinue the practice of abortion (Tr. p. 43, line 25; p. 44, lines 2–8).

4. Police have interpreted the statute in different ways and have difficulty deciding the meaning of the words "interfere", "obstruct", "impede", and "delay" (Tr. p. 23, lines 3–25; p. 24, lines 1–4; p. 45, lines 2–24; p. 14, lines 1–25; p. 15, line 1; p. 73, lines 1–25; p. 74, lines 1–2; p. 18, lines 1–25; p. 19, lines 1–25; p. 20, lines 1–25; p. 21, lines 1–25; p. 22, lines 1–14; p. 44, lines 15–25; p. 45, lines 1–25; p. 46, lines 1–25; p. 25, lines 23–25; p. 26, lines 1–22; p. 28, lines 19–25; p. 29, lines 1–25; p. 30, lines 1–6; p. 77, lines 19–22).

5. The Plaintiffs have attempted to have police define for them exactly what they may and may not do in order to comply with the statute, but have received varying interpretations from police officers (Tr. p. 13, lines 15–25; p. 14, lines 1–11; p. 35, lines 16–25; p. 65, lines 10–19).

6. There are different interpretations in different police districts and among police in the same district. For example, some police officers have told picketers they may not walk on the public sidewalk which crosses a driveway into the clinic, and have drawn imaginary lines on the sidewalk on each side of the driveway into the clinic and told the Plaintiffs they may not cross those lines and proceed on the sidewalk across the driveway, even if no cars are in sight. Other officers allow the picketers to cross the driveway so long as they do not block an approaching vehicle from passing. Some officers prohibit the handing out of leaflets to occupants of automobiles entering the clinic because that will impede traffic and constitute interference under the statute. Some officers allow the picketers to wave pro-life literature to get the attention of persons entering the driveway. Others do not. Some officers allow the leafletters to yell to people in the parking lot, others don't. If the leafletters walk into the parking lot with literature some officers hold that to be trespassing. (See Reference to Finding of Fact 5).

7. The Plaintiffs are aware that their conduct is regulated by the state and federal laws they have challenged but fear that those statutes will subject them to criminal and civil prosecution and liability for damages. The continued threats of arrest have had a chilling effect on the Plaintiffs' desire to continue their activities and have intimidated them from continuing the exercise of the First Amendment right to protest (Tr. p. 24, lines 16–20; p. 25, lines 1–

17; p. 63, lines 1–25; p. 55, lines 4–13; p. 73, lines 14–19; p. 53, lines 11–19; p. 89, lines 20–25; p. 90, lines 1–16).

8. Officers are often persuaded by abortion clinic personnel to change their minds on some pronouncement they have made (Tr. p. 65, lines 10–19; p. 18, lines 20–25; p. 19, line 1; p. 15, lines 18–25; p. 16, lines 1–23; p. 21, lines 2–11; p. 24, lines 16–25; p. 25, lines 1–5; p. 28, lines 19–25; p. 29, lines 1–16).

9. None of the Plaintiffs have been a party to any form of violence or participated in any "sit in" since the enactment of the Statute (Tr. p. 42, lines 12–14; p. 58, lines 3–7; p. 68, lines 5–13; p. 79, lines 10–25; p. 80, lines 1–7; p. 89, lines 10–15).

10. The Plaintiffs and other protestors have stopped picketing often because of threats of arrest while lawfully picketing and leafletting. (Tr. p. 35, lines 11–25; p. 36, lines 1–2; p. 48, lines 1–18; p. 51, lines 3–20; p. 53, lines 11–19; p. 55, lines 1–13; p. 63, lines 3–25; p. 76, lines 21–25; p. 77, lines 1–2; p. 78, lines 21–25; p. 79, lines 1–25; p. 80, lines 1–7; p. 89, lines 16–25; p. 90, lines 1–16).

11. None of the protestors, including the Plaintiffs, have in any way engaged in anything more than speech which did not involve threats, force or obstruction or physical impediment, but did interfere with abortion patients through peaceful persuasion (Tr. p. 9, lines 12–22; p. 37, lines 21–25; p. 38, lines 1–23; p. 42, lines 12–25; p. 43, lines 1–4; p. 50, lines 18–24; p. 58, lines 3–7; p. 79, lines 10–25; p. 80, lines 1–7).

12. Because of the activities described above, the Plaintiffs brought suit alleging that the North Carolina's statute prohibiting obstruction of access to health care facilities, N.C.G.S. § 14–277.4, violated their First Amendment right to peacefully protest abortion both on its face and as applied to their protest activities. While the suit was pending, Congress passed the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248, so the Plaintiffs requested leave to amend their complaint and leave was given. In their amended complaint, the Plaintiffs alleged that Congress had no authority to regulate their protest activity under the Commerce Clause or the Fourteenth Amendment, and further that FACE violated their First Amendment right to free speech. The Plaintiffs seek declaratory and injunctive relief barring the application of both statutes.

## C. *Conclusions of Law.*

### 1. *Defendants' Motion for Summary Judgment.*

 The Defendants have moved for summary judgment on Plaintiffs' claims.[2] Summary judgment is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c) of the Federal Rules of Civil Procedure. The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see* F.R.Civ.P. 56(e) (in response to

---

**2.** The Defendants filed a Motion to Dismiss and Motion for Summary Judgment on March 6, 1995. The Plaintiffs filed a Memorandum in Opposition to Defendants' Motion on April 27, 1995. The Court notes that the Plaintiffs filed affidavits to support their position, but the Defendants have not filed any affidavits. In addition, the Court has held an evidentiary hearing on this matter at which the Plaintiffs put on evidence concerning the operation of N.C.G.S. § 14–277.4. Again the Defendants offered no evidence in rebuttal. The Court will consider the Plaintiffs' affidavits and other evidence for the purposes of resolving the motions before the Court. Because both sides had an opportunity to offer evidence, the Court will treat the Motion to Dismiss as a Motion for Summary Judgment pursuant to Rule 12(b) of the Federal Rules of Civil Procedure and dispose of it as provided in Rule 56 of the Federal Rules of Civil Procedure.

motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). When considering motions for summary judgment, courts must view facts and inferences in the light most favorable to the party opposing the motion for summary judgment. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational fact-finder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. In this case, the Plaintiffs have offered evidence by way of affidavit and testimony, but the Defendants have offered no evidence in support of their Motion for Summary Judgment. Therefore, there is no genuine dispute of material fact that precludes the final disposition of the Defendants' Motion, and that Motion will be denied.

2. *Plaintiffs' Motion for Declaratory Relief from N.C.G.S. § 14–277.4.*

The Plaintiffs argue that N.C.G.S. § 14–277.4 is vague and overbroad such that it chills and unconstitutionally limits their First Amendment right to peacefully protest abortion. In this Court's opinion in *Hoffman v. Hunt*, 845 F.Supp. 340 (W.D.N.C.1994), the Court denied Defendants' Motion to Dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and found that the complaint stated a claim for a First Amendment overbreadth challenge sufficient to overcome a motion to dismiss. The Court also preliminarily found the statute sufficiently vague to overcome a motion to dismiss for failure to state a claim and consequently denied that motion, as well as the Defendants' motions to abstain, and to dismiss for lack of subject matter jurisdiction. In the same opinion, the Court denied Plaintiffs' application for a temporary restraining order and a preliminary injunction and ordered the Defendants to file their answer as required by Rule 12(a) of the Federal Rules of Civil Procedure. This matter is now before the Court on Defendants' motion for summary judgment. Defendants have not produced any evidence or argument that addresses the concerns initially raised by the Court. In fact, the very fears of vagueness and overbreadth which the Defendants once characterized as speculative have been confirmed in disturbing detail by the unrebutted evidence in this case. Therefore, this Court confirms its prior ruling as to the vagueness and overbreadth of the statute with the additions set forth below.

■ The First Amendment of the United States Constitution provides:

**Amendment I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

These First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the State. *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963).

North Carolina General Statute Sections 14–277.4(a) and (e) provide as follows:

**§ 14–277.4. Obstruction of health care facilities.**

(a) No person shall obstruct or block another person's access to or egress from a health care facility or from the common areas of the real property upon which the facility is located in a manner that deprives or delays the person from obtaining or providing health care services in the facility.

. . . .

(e) This section shall not prohibit any person from engaging in lawful speech or picketing which does not impede or deny another person's access to health care services or to a health care facility or interfere with the delivery of health care services within a health care facility.

*Id.* Several of the terms in this statute are vague, particularly as applied. Moreover,

the language does not restrict its application to only those instances where the obstruction or blocking of another person's access to or egress from a health care facility, or deprivation or delay of a person from obtaining or providing health care is by force or violence or by physical obstruction. Nor does the statute provide for criminal penalties only against those who *intentionally* injure, intimidate or interfere with or attempt to injure, intimidate or interfere with any person or deprive or delay the person from obtaining or providing health care services in the facility. Instead, the statute as written and as applied reaches and goes beyond physical violence or intentional conduct and applies to speech protected by the First and Fourteenth Amendments.

■ The protection against vague and overbroad statutes is an essential attribute of the constitutional protection afforded speech and expressive conduct by the Constitution for, as the Supreme Court explained in *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972):

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to

" 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked.' " (footnotes omitted).

*Id.* at 108–09, 92 S.Ct. at 2298–99.

■ The Tenth Circuit in *U.S. v. Protex Industries, Inc.,* 874 F.2d 740 (10th Cir.1989) elaborated on this point:

> Although a statute's meaning may be plain on its face, it can be rendered unconstitutionally vague as applied. The void for vagueness doctrine finds its basis in the guarantee of due process. In *Connally v. General Const. Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), the United States Supreme Court elaborated on the void for vagueness doctrine. "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Id.* at 391, 46 S.Ct. at 127. A statute can be void for vagueness not only on its face, but as applied, as a result of "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie v. City of Columbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964). Whether a court is analyzing a statute as void for vagueness on its face or as applied, the essence of the doctrine is that a potential defendant must have some notice or "fair warning" that the conduct contemplated is forbidden by the criminal law.

*Id.* at 743. These principles inform the Court's reading of North Carolina's statute.

(a) *N.C.G.S. §§ 14–277(a) and (e) are Vague.*

■ The Court finds that North Carolina's statute is unconstitutionally vague.[3]

---

**3.** "Vague" is an adjective which is defined as "not clearly grasped in the mind, not precise in

expression, not firmly determined, hazy, not clearly perceived, not clearly formulating or ex-

As has been demonstrated by the Plaintiffs' affidavits, documents # 67 and # 68, filed April 27, 1995, and evidence presented at the evidentiary hearing on February 2, 1996, the police do not understand what the terms of the statute mean and how it should be enforced.

For instance:

(1) the police have interpreted traversing a driveway across a public sidewalk as constituting "interference" "delay" "impeding" and "obstructing";

(2) police told a minister that "preaching" was interfering with people driving into the clinic;

(3) kneeling on a grassy knoll between the sidewalk and street was "escalating the situation"; and

(4) officers disagree among themselves as to the meaning of the statute.

Even the State's attorney in oral argument on January 14, 1994 on Plaintiffs' Motions for a Temporary Restraining Order and Preliminary Injunction, when asked why subsection (e) was necessary if subsection (a) was so clear, replied that it was possible for a person to engage in speech "so obstreperous" that it would impede access to a health care facility. She then added that she could not imagine this provision would apply to speech unless "someone really crosses the line." When is speech so "obstreperous" that it really crosses the line? Who is going to define the line and say where it is? Apparently the police can't locate it. When one of the picketers tried to have the police define what the statute means so she would know how not to violate it, the only answer from the police was that she would know when they arrested her. (Tr. p. 26, lines 3–22).

The Court finds no reason to believe that the officers charged with enforcing this statute were of less than ordinary intelligence. As a result, the Court concludes that the evidence in this case clearly establishes that *first* a person of ordinary intelligence is not given a reasonable notice concerning what protest activity is prohibited so that he or she can act accordingly; *second* the statute does not provide explicit standards for those who apply them so as to prevent arbitrary and discriminatory enforcement and application; and *third* the statute operates to inhibit the exercise of First Amendment freedoms.

(b) *The Statute is Overbroad.*

■ The Court also finds that the statute is overbroad. The language of the statute does not restrict its application to those instances where the obstruction or blocking of another person's access to or egress from a health care facility, or deprivation or delay of a person from obtaining or providing health care is by force or violence or by physical obstruction. Nor does the statute provide for criminal penalties against anyone who *intentionally* injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person or deprive or delay the person from obtaining or providing health care services in the facility. Nonviolent and totally voluntary picketing may cause a disruption of the economic activity of an abortion clinic, (euphemistically termed "reproductive health service,") but such activity and the consequences thereof must be weighed against the never changing constant of strong national commitment to the principal that "debate on public issues should be uninhibited, robust and wide open." *See New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686. The statute as written and as applied reaches and goes beyond physical violence and applies to speech protected by the First and Fourteenth Amendments.

The Defendants claim that the statute is necessary because "citizens of this State have been confronted by protestors in various blockades and 'rescues' at health care facilities, and have been required to force their way through hostile crowds of people to gain entrance to these facilities." (See pp. 21–23 Memorandum of Law on behalf of State Defendants in Support of Motion to Dismiss and Motion for Summary Judgment filed March 6, 1995). The Court assumes that the Defendants have a legitimate interest in prohibiting the activities they describe, but notes that legislative intervention can find constitutional justification only by dealing with the

pressing ideas." *Webster's Dictionary of the En-* *glish Language* 1085 (2d ed. 1989).

abuse. The First Amendment rights of Plaintiffs such as those before the Court cannot be curtailed as a result of efforts to address illegal conduct. As the Supreme Court said of First Amendment rights long ago:

These rights may be abused by using speech or press or assembly in order to incite to violence and crime. The people through their legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed.... If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge.

*De Jonge v. Oregon,* 299 U.S. 353, 364–365, 57 S.Ct. 255, 259–260, 81 L.Ed. 278 (1936). In this case, North Carolina's statute is not limited to the regulation of activities unprotected by the First Amendment, and therefore, that statute is unconstitutionally overbroad.

By reason of the evidence concerning the statute's application set forth above, the Court also finds that the North Carolina's statute is unconstitutional as applied for the end result of that statute's vagueness has been the very sort of arbitrary and overbroad application the vagueness and overbreadth doctrines are designed to prevent. There is no doubt that the statute has been enforced—at least in Charlotte, North Carolina—in an arbitrary way that has violated the First Amendment rights of the Plaintiffs and chilled those rights.

### III. *UNITED STATES CODE TITLE 18, SECTION 248*

#### A. *Plaintiffs' Prayer for Declaratory Relief and Permanent Injunction.*

1. *The Statute.*

While this case was pending, Congress enacted the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248 ("FACE"). The Act provides, in relevant part:

(a) Prohibited Activities.—Whoever—

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services; ... shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at the minor.

18 U.S.C. § 248. The stated purpose of the act was "to protect and promote the public safety and health and activities affecting interstate commerce...." *See* 18 U.S.C. § 248, statutory note, setting forth Section 2 of Pub.L. 103–259 (the statement of purpose).

The Plaintiffs believed that FACE threatened their First Amendment Right to protest abortion, and therefore, sought leave of this Court to amend their complaint so they might challenge the statute. This Court granted their request. In their amended complaint, the Plaintiffs have advanced several challenges to the federal statute that now governs their protest activities. Relying on the Supreme Court's recent decision in *U.S. v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Plaintiffs contend that Congress has no authority to regulate their protest under the Commerce Clause. They also assert that the Fourteenth Amendment provides no basis for the regulation of their purely private actions. In addition, the Plaintiffs argue that even if Congress has the authority to regulate their protest activity, the statute Congress enacted violates their First Amendment rights.

The Defendants disagree. According to the Defendants, this case is governed by the Fourth's Circuit's opinion in *American Life*

*League v. Reno,* 47 F.3d 642 (4th Cir.1995), which indicates that Congress has authority to enact FACE under the commerce power, and further, that the statute does not violate the First Amendment. The Defendants also assert that Congress had authority to enact FACE pursuant to Section 5 of the Fourteenth Amendment.

### 2. The Constitutional Authority Relied Upon by Congress.

Congress based its constitutional authority to enact FACE on two independent sources of constitutional authority, the Commerce Clause, Article I, Section 8, Clause 3, of the Constitution, and Section 5 of the Fourteenth Amendment. So the starting point for this Court's analysis is the language of those constitutional provisions. Article I, Section 8, Clause 3 of the Constitution provides that "[t]he Congress shall have power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...." *Id.* Sections 1 and 5 of the Fourteenth Amendment provide:

**Amendment XIV**

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

\*　　\*　　\*　　\*　　\*　　\*

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

*Id.* The Court will address Congress' authority under the Commerce Clause first and

return to the Fourteenth Amendment argument later in this opinion.

(a) *Commerce Clause Challenge.*

 The single straight-forward clause in Article I, Section 8, Clause 3, of the Constitution that "The Congress shall have the power to regulate Commerce with foreign nations, and among the several states and the Indian Tribes" has generated an inordinate number of judicial decisions because some courts fail to appreciate that our national government is one of limited and enumerated powers rather than an all powerful national government with jurisdiction to manage and regulate the general affairs of its citizens. As the Supreme Court pointed out in *Lopez,* Congress' authority pursuant to Art. I, § 8, cl. 3, while plenary within its sphere, is limited to the regulation of three broad categories of activity:

1. The use of channels of interstate commerce

2. Protection of the instrumentalities of interstate commerce or persons or things in interstate commerce even though the threat may come only from intrastate activities.

3. The regulation of those activities having a substantial relation to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce.

*Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1629–1630.[4] The Supreme Court also indicated that within the third category the Supreme Court's case law had not been clear whether the activity must "affect" or "substantially affect" interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause. The Court concluded that consistent with the great weight of the Court's case law that the proper test requires an analysis of whether the regulated activity "substantially affects" interstate commerce. *Id.*[5]

---

**4.** In his concurring opinion Justice Thomas points out that the Constitution does not support the proposition that Congress has authority over all activities that "substantially" affect interstate commerce and that the Framers could have drafted a constitution that contained a "substantially affects" interstate commerce clause had that been their objective. *Id.* at ——, 115 S.Ct. at 1644.

**5.** For this reason, the Court agrees with the Plaintiffs that *Lopez, supra,* represents new law which must inform the proper resolution of this case. In *Lopez,* the Supreme Court clarified that Congress can only regulate activity that substan-

While Congress did make findings to support its determination that it had constitutional authority under the Commerce Clause to enact FACE, the Court believes these findings do not support Congress' conclusion that the abortion protest activity regulated by FACE "substantially affects" interstate commerce. One of Congress' findings is that FACE regulates a problem that is national in scope. The Senate Committee on Labor and Human Relations Report (S.Rep. No. 117, 103rd Cong. 1st Sess. 3 (1993)) states:

> the problem Congress is addressing is national in scope and exceeds the ability of a single state or local jurisdiction to solve. Under these principles, S. 636 falls easily within the commerce power.

*Id.* at 31. The Court believes it can be said without fear of contradiction, however, that breaking and entering of homes and businesses, rape, burglary, assault and even murder, among other crimes, are problems which are national in scope, and apparently exceed the ability of a single state or local jurisdiction to solve. Moreover, every crime against property or persons obviously affects interstate commerce to some minimal degree. The Congress' reasoning calls to mind the idiom that little fleas have littler fleas on their backs to bite them and littler fleas have littler fleas on their backs to bite them and so on *ad infinitum.* The Supreme Court rejected similar congressional reasoning in *Lopez,* where the Court held that Congress did not have authority to enact 18 U.S.C. § 922(q):

> To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action.

See *supra,* at 1629. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, *cf. Gibbons v. Ogden, supra,* [9 Wheat. 1,] at 195, [6 L.Ed. 23,] and that there never will be a distinction between what is truly national and what is truly local, *cf. Jones & Laughlin Steel, supra,* [301 U.S. 1,] at 30, 57 S.Ct. [615], at 621[, 81 L.Ed. 893]. This we are unwilling to do.

*Lopez,* —— U.S. at ——, 115 S.Ct. at 1634. The Court finds this case to be virtually identical to *Lopez.* The mere fact that Congress believes a problem is national in scope does not warrant ignoring the constitutional requirement that an activity must have a substantial effect on interstate commerce to justify the transformation of state law crimes into federal offenses in the absence of an independent constitutional basis for congressional authority.

Another of the legislative findings made in support of Congress' authority to enact FACE is that abortion clinics affect interstate commerce. The Senate Committee Report continues:

> Clinics and other abortion service providers clearly are involved in interstate commerce, both directly and indirectly. They purchase medicine, medical supplies, surgical instruments and other necessary medical products, often from other States; they employ staff; they own and lease office space; they generate income. In short, the Committee finds that they operate within the stream of interstate commerce.

S.Rep. No. 103–117, 103rd Cong., 1st Sess. 31 (1993). But it must be kept in mind that the regulatory target of FACE is the protest activity by the Plaintiffs, not the abortion

---

tially affects interstate commerce pursuant to Art. I § 8, cl. 3, although some earlier cases had seemed to indicate that Congress could regulate any activity that affected interstate commerce. In *American Life League, supra,* the Fourth Circuit applied the mere affects formulation of the Commerce Clause test and therefore concluded that "the commerce power permits Congress to

regulate activities *affecting* reproductive health services." *Id.* at 647 (emphasis added). Neither this test nor the Commerce Clause holding in *American Life League, supra,* are viable after *Lopez.* In addition, the Court also finds that *Lopez,* clarifies several limitations on Congress' commerce power which further dictate that FACE is invalid for the reasons given in this opinion.

clinic. In fact, the Senate Committee Report itself makes this clear when it describes the impact of the statute:

> Thus, for example, if an environmental group blocked passage to a hospital where abortions happen to be performed, but did so as part of a demonstration over harmful emissions produced by the facility, the demonstrators would not violate this Act (though their conduct might violate some other law, such as a local trespass law). In that example, the demonstrators' motive is related to the facility's emissions policy and practices and not to its policy and practices on abortion-related services. The Committee has concluded that inclusion of the motive elements is important to ensure that the Act is precisely targeted at the conduct that, as the Committee's record demonstrates, requires new Federal legislation: deliberate efforts to interfere with the delivery of abortion-related services.

*Id.* at 24. Here again the issue is whether the actions of those persons who engage in protests at an abortion clinic may be subject to criminal prosecution by the Federal Government under a statute enacted by Congress under the purported authority of the Commerce Clause of the U.S. Constitution, not whether Congress can regulate commerce.

Another category which the Report includes to justify the enactment of this law under the Commerce Clause is that patients travel in interstate commerce to seek abortion services. The Senate Committee Report continues:

> [M]any of the patients who seek services from these facilities engage in interstate commerce by traveling from one state to obtain services in another. In *Bray,* the Supreme Court accepted the district court's finding that substantial numbers of women travel interstate to seek abortion services. *Bray v. Alexandria Women's Health Clinic, supra,* [506 U.S. 263 at 274,] 113 S.Ct. 753 at 762[, 122 L.Ed.2d 34].

*Id.* at 31. The Senate Committee Report also states:

> Clinic employees sometimes travel across State lines to work as well. Like Dr. Gunn, the physician who was killed in Pensacola, Fl., some doctors who perform abortions work in facilities in more than one State.

*Id.* The Court is nonplussed to understand why the Committee cites *Bray,* however, for there is no contention that the protestors hinder in any way the interstate travel of women seeking abortions or that their protests are designed to interfere with their right to travel. In fact, *Bray* held that:

> [p]etitioners oppose abortion, and it is irrelevant to their opposition whether the abortion is performed after interstate travel.

> Respondents have failed to show a conspiracy to violate the right of interstate travel for yet another reason: Petitioners' proposed demonstrations would not implicate that right. The federal guarantee of interstate travel does not transform state-law torts into federal offenses when they are intentionally committed against interstate travelers. Rather, it protects interstate travelers against two sets of burdens: "the erection of actual barriers to interstate movement" and "being treated differently" from intrastate travelers. (Citations omitted). (Art. IV, § 2 "inhibits discriminating legislation" against [citizens of other states and] gives them the right of free ingress into other States, and egress from them) (citations omitted). (Art. IV, § 2 "insure[s] to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy"). As far as appears from this record, the only "actual barriers to movement" that would have resulted from Petitioner's proposed demonstrations would have been in the immediate vicinity of the abortion clinics, restricting movement from one portion of the Commonwealth of Virginia to another. Such a purely intrastate restriction does not implicate the right of interstate travel, even if it is applied intentionally against travelers from other States, unless it is applied *discriminatorily* against them. That would not be the case here, as respondents conceded at oral argument.

*Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 276, 113 S.Ct. 753, 763, 122

L.Ed.2d 34 (1993). *Bray* shows that Congress cannot use the interstate movement of patients and staff to justify FACE.

The Senate Committee Report also asserts that the protest activity regulated by FACE affects interstate commerce. The Report continues:

[A]s Attorney General Reno noted, the types of activities that would be prohibited by S. 636 have a negative effect on interstate commerce. As the record before the Committee demonstrates, clinics have been closed because of blockades and sabotage, and have been rendered unable to provide services. Abortion providers have been intimidated and frightened into ceasing to perform abortions. Clearly, the conduct prohibited by S. 636 results in the provision of fewer abortions and less interstate movement of people and goods. This situation is analogous to Congress's exercise of the commerce power in passing Title II of the Civil Rights Act of 1964, which was premised on the conclusion that restaurants that discriminated served fewer customers, and therefore suppressed interstate commerce. *See Heart of Atlanta Motel v. United States,* 379 U.S. 241[, 85 S.Ct. 348, 13 L.Ed.2d 258] (1964). Here, of course, the very purpose of those engaging in the conduct addressed by S. 636 is to suppress the provision of abortion services.

Accordingly, the Committee concludes that Congress clearly has the authority to enact this law pursuant to the Commerce Clause.

S.Rep. No. 103–117, 103rd Cong., 1st Sess. 31–32 (1993). But, as explained further below, the notion that Congress can enact FACE because the activities of protestors result in fewer abortions as well as less interstate movement of people and goods is really straining at gnats. In fact, FACE is not aimed at the commercial activity of abortion clinics. It is aimed at the basic freedom of individuals to engage in civil protest.

House Report No. 103–306, 103rd Cong. 1st Sess. U.S.Code Cong. & Admin.News 1994 p. 699 attempts to justify the legislation by enumerating the reprehensible conduct of some of those who have engaged in violence to promote their views:

*Need for Federal remedies to protect patients and providers of reproductive health services*

A nationwide campaign of blockades, invasions, vandalism, threats and other violence is barring access to facilities that provide reproductive health services, including services arising from the constitutionally protected right to choose. This dramatically escalating violence is endangering the lives and well-being of patients, providers, and their respective families. Seemingly frustrated by lack of success in courts, state legislatures and public opinion, certain factions within the pro-life movement have turned increasingly to violent means to stop clinics from operating, to prevent patients from gaining access to clinics, and to prevent doctors and other professionals from providing reproductive health care.

This campaign of violence has lead to death, injury, harassment, fear, and thousands of arrests all across the nation. It has resulted, as intended, in access to the constitutionally protected right to choose being denied to thousands of women nationwide against their wills. The record before the Committee establishes that state and local law enforcement is often inadequate (and sometimes unwilling) to handle this situation; that this is a problem of national proportion—incidents have occurred all across the nation, large-scale operations have been and are continuing to be organized on an inter-state basis, and women travel interstate to obtain reproductive health care services; and that Federal legislation is needed to put a stop to the violence and disorder and to restore access to constitutionally protected rights.

The activities to which H.R. 796 responds take many forms including blockades and invasions of clinics; violence and threats of violence against providers and their families; and vandalism and destruction of property at facilities. According to the National Abortion Federation, from 1977 to April 1993, more than 1000 acts of violence against providers of reproductive health services were reported in the United States. These acts included at least 36

bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic "invasions," and one murder. In addition, over 6000 clinic blockades and other disruptions have been reported since 1977.

H.R.Rep. No. 103–306, 103rd Cong., 1st Sess. pp. 6–7 (1993), *reprinted in* 1994 U.S.C.C.A.N. 699, 703–04. The violent acts referred to in the Report, however, are not condoned by more than a relatively small number of pro-life protestors, and the legislation is not limited to these violent acts. Further, the Report indicates there have been thousands of arrests all over the nation by local law enforcement officials under existing statutes. The incidents of murder, assault, trespass, vandalism, blockades, violence and threats of violence, destruction of property, etc. cited by the Report are traditionally state crimes already addressed by existing state laws. As noted below, *Lopez* shows that congressional enactments that intrude into these areas are suspect, especially where, as here, the statute regulates activity that has no discernible relationship to interstate commerce. *See Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1631–33.

More importantly, in *Lopez,* the Supreme Court reaffirmed that congressional authority under Art. I, § 8, cl. 3, is limited to interstate commerce and activities that substantially affect interstate commerce. That principle is well established. In *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), the Supreme Court speaking through Mr. Justice Harlan cited Mr. Chief Justice Hughes in *Santa Cruz Fruit Packing Co.,* 303 U.S. at 466, 58 S.Ct. at 660:

The subject of federal power is still "commerce," and not all commerce but commerce with foreign nations and among the several states. The expansion of enterprise has vastly increased the interests of interstate commerce, but the "constitutional differentiation still obtains." *Santa Cruz Fruit Packing Co. v. National Labor Relations Board,* 303 U.S. 453, 466, 58 S.Ct. 656, 660, 82 L.Ed. 954.

The Court has ample power to prevent what the appellants purport to fear, "the utter destruction of the State as a sovereign political entity."

*Id.* at 196, 88 S.Ct. at 2024. The Court also explained that:

[n]either here nor in *Wickard* (*Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122) has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities. The Court has said only that where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.

*Id.* n. 27.

This principle was recently reaffirmed in *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), where the Court rejected the argument that Congress could regulate the interference with access to abortion clinics caused by abortion protestors because some individuals seeking abortions traveled interstate. There the Court wrote:

Respondents, like the courts below, rely upon the right to interstate travel—which we have held to be, in at least some contexts, a right constitutionally protected against private interference, (citations omitted). But all that respondents can point to by way of connecting petitioners' actions with that particular right is the District Court's finding that "[s]ubstantial numbers of women seeking the services of [abortion] clinics in the Washington Metropolitan area travel interstate to reach the clinics." 726 F.Supp., at 1489. That is not enough. As we said in a case involving 18 U.S.C. § 241, the criminal counterpart of § 1985(3):

"[A] conspiracy to rob an interstate traveler would not, of itself, violate § 241. But if the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right, then ... the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought." (Citations omitted).

*Id.* at 274–275, 113 S.Ct. at 762. In short, the Supreme Court continues to recognize that when Congress acts pursuant to its commerce power, it must link its regulation to activities that have an explicit connection with interstate commerce. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1631.

There are also important constitutional imperatives which indicate that Congress may not enact legislation which addresses areas traditionally left to the states thereby undermining the role of the states in our federal system. Justice Kennedy observed in his concurrence in *Lopez:*

> federalism was the unique contribution of the Framers to political science and political theory. (citations omitted). Though on the surface the idea may seem counterintuitive, it was the insight of the Framers that freedom was enhanced by the creation of two governments, not one. "In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself." The Federalist No. 51, p. 323 (C. Rossiter ed. 1961) (J. Madison). (citations omitted). ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front. . . . In the tension between federal and state power lies the promise of liberty"); *New York v. United States, supra,* [505 U.S. 144,] at 180, 112 S.Ct. [2408] at 2431[, 120 L.Ed.2d 120] ("[T]he Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power'") (citations omitted).

\* \* \* \* \* \*

The theory that two governments accord more liberty than one requires for its realization two distinct and discernable lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States. If, as Madison expected, the federal and state governments are to control each other, see The Federalist No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function. "Federalism serves to assign political responsibility, not to obscure it." *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 636, 112 S.Ct. 2169, 2178, 119 L.Ed.2d 410 (1992). Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory. *See New York v. United States, supra,* at 154–163, 112 S.Ct., at 2417–2422; *FERC v. Mississippi,* 456 U.S. 742, 787, 102 S.Ct. 2126, 2152, 72 L.Ed.2d 532 (1982) (O'CONNOR, J., concurring in judgment in part and dissenting in part). The resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power.

\* \* \* \* \* \*

For these reasons, it would be mistaken and mischievous for the political branches to forget that the sworn obligation to preserve and protect the Constitution in maintaining the federal balance is their own in the first and primary instance. In the Webster–Hayne Debates, *see* The Great Speeches and Orations of Daniel Webster 227–272 (E. Whipple ed. 1879), and the debates over the Civil Rights Acts, see Hearings on S. 1732 before the Senate Committee on Commerce, 88th Cong., 1st Sess., pts. 1–3 (1963), some Congresses have accepted responsibility to confront the great questions of the proper federal

balance in terms of lasting consequences for the constitutional design. The political branches of the Government must fulfill this grave constitutional obligation if democratic liberty and the federalism that secures it are to endure.

At the same time, the absence of structural mechanisms to require those officials to undertake this principled task, and the momentary political convenience often attendant upon their failure to· do so, argue against a complete renunciation of the judicial role. Although it is the obligation of all officers of the Government to respect the constitutional design, *see Public Citizen v. Department of Justice,* 491 U.S. 440, 466, 109 S.Ct. 2558, 2572–2573, 105 L.Ed.2d 377 (1989); *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981), the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far.

*Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1638–39.

Similarly, Justice Thomas points out in his concurring opinion that *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) did not hold that whatever Congress believes is a national matter becomes an object of Federal control. Rather, *Gibbons* held that federal power does not encompass "commerce" that does not extend to an effect·on other States.

There is a much better interpretation of the "affect[s]" language: because the Court had earlier noted that the commerce power did not extend to wholly intrastate commerce, the Court was acknowledging that although the line between intrastate and interstate/foreign commerce would be difficult to draw, federal authority could not be construed to cover purely intrastate commerce. Commerce that did not affect another State could *never* be said to be commerce "among the several States."

\* \* \* \* \* \*

The second source of confusion stems from the Court's praise for the Constitution's division of power between the States and the Federal Government:

"The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." *Id.* at 195.

In this passage, the Court merely was making the well understood point that the Constitution commits matters of "national" concern to Congress and leaves "local" matters to the States. The Court was *not* saying that whatever Congress believes is a national matter becomes an object of federal control. The matters of national concern are enumerated in the Constitution: war, taxes, patents, and copyrights, uniform rules of naturalization and bankruptcy, types of commerce, and so on. See generally, U.S. Const., Art. I, § 8. *Gibbons'* emphatic statements that Congress could not regulate many matters that affect commerce confirm that the Court did not read the Commerce Clause as granting Congress control over matters that "affect the States generally." *Gibbons* simply cannot be construed as the principal dissent would have it.

*Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1647–48. In short, this Court believes that Congress rested its authority to enact FACE on the very sorts of arguments rejected by the Supreme Court in *Lopez.*

Indeed, this case is almost identical to *Lopez, supra,* where the Supreme Court held that the Gun Free Schools Act of 1990, 18 U.S.C. § 922(q)(1)(A), exceeded the authority of Congress "[t]o regulate Commerce ... among the several States ..." provided in the U.S. Const., Art. I. § 8, cl. 3, because the statute regulated activity that did not "substantially affect" interstate commerce. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1634. The Court gave two reasons for its holding. First, the Court found that § 922(q) was not within the scope of Congress' commerce power because the provision was not enacted

pursuant to a larger regulation of economic activity and did not regulate a commercial activity which, when viewed in the aggregate, substantially affected interstate commerce. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630–31. Second, the Court also found that Congress had exceeded its commerce power when it enacted the Gun–Free School Zones Act because the statute lacked any jurisdictional element that would ensure, through a case-by-case inquiry, that the statute's reach was limited to that discrete part of the regulated activity that had an explicit connection with or effect on interstate commerce. *Id.* at ——, 115 S.Ct. at 1631.

This Court sees no significant distinction between FACE and the provision of the Gun–Free School Zones Act struck down by the Supreme Court in *Lopez.* In this case, the federal statute purports to regulate the activity of persons who protest outside abortion clinics and here, as in *Lopez,* the regulated activity is not commerce or economic enterprise, however broadly one might define those terms. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. Thus FACE, like § 922(q) of the Gun–Free Zones Act at issue in *Lopez,* cannot be sustained under cases upholding regulation of activities arising out of, or connected with, a commercial transaction which, when viewed in the aggregate, substantially affect interstate commerce. *Cf. Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1630–31. Similarly, even if Congress could properly regulate the Plaintiffs' protest activities and rationally conclude that those activities substantially affect interstate commerce, the statute does not contain an express jurisdictional element which would ensure, through case-by-case inquiry, that the noncommercial activity regulated by the statute has an explicit connection with or effect on interstate commerce. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1631.

Despite the pronounced similarity of this case and *Lopez,* the Attorney General asserts that Congress had authority to enact FACE pursuant to its commerce power. According to the Attorney General, FACE comes well within the scope of congressional authority under the Commerce Clause because Congress rationally concluded that the conduct regulated by the statute had a substantial affect on interstate commerce or protects persons or things in interstate commerce. The Attorney General relies upon three congressional findings: 1) that some abortion patients and providers travel interstate; 2) that clinics performing abortions buy and sell goods and services in interstate commerce such that the protest activities regulated by FACE have a negative impact on the interstate commerce; and 3) that the problem posed by abortion protestors is national in scope. *See* S.Rep. No. 103–117, 103rd Cong., 1st Sess. (1993); H.R.Rep. No. 103–306 (1993); H.R.Conf.Rep. No. 103–488, 103rd Cong., 2d Sess., p. 7, *reprinted in* 1994 U.S.C.C.A.N. 724. According to the Attorney General, these congressional findings are entitled to considerable deference, and they indicate that Congress rationally concluded that the activities regulated by FACE are well within the scope of authority conferred by the Commerce Clause.

This Court disagrees with the Attorney General. For one thing, this Court believes that Congress cannot regulate the protest activities of the Plaintiffs because those activities, like the gun possession at issue in *Lopez,* are simply not properly characterized as commercial or economic activities. FACE, like the provision at issue in *Lopez,* "is a criminal statute that by its terms has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms", and "[i]t cannot therefore be sustained under ... cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1630–31.

Indeed, this Court believes that the Supreme Court's opinion in *Lopez* is significant precisely because it clarifies a limit upon Congress' commerce power that was implicit in Commerce Clause precedent but neglected until now. The *Lopez* Court made clear that congressional authority over those activities that substantially affect interstate commerce (the third category of activities described in *Lopez* ) is limited to those activities that can fairly be characterized as commercial or eco-

nomic. Otherwise, Congress could very well regulate such subjects as family law, day-care, education, and any other facet of our daily lives pursuant to its authority under Art. I, § 8, cl. 3, by simply finding that those activities substantially affect interstate commerce; for those activities surely do affect interstate commerce more than the protest activities at issue here. Such a result is the very reason why the Court held that Congress did not have authority to enact 18 U.S.C. § 922(q). It could not be otherwise because such an expansive view of the commerce power, if accepted, would transform Congress' authority "[t]o regulate Commerce . . . among the several States . . .", granted in Art. I, § 8, cl. 3, of the Constitution into "a plenary police power that would authorize enactment of every type of legislation," *Lopez*, —— U.S. at ——, 115 S.Ct. at 1633. The effect of such a view would therefore eviscerate the limited government secured by the enumeration of federal powers contained in the Constitution.

The *Lopez* Court noted that "a determination of whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty." *Id.* But the Court believes this case is a fairly easy one. Here as in *Lopez*, the statute addresses an area of traditional state concern and neither the actors nor their conduct have an evident commercial character. Under these circumstances, the Court finds that Congress exceeded its power under Art. I., § 8, cl. 3, when it sought to regulate the protest activities of the Plaintiffs, because those activities are neither commerce or economic enterprise however broadly one might define those terms, and therefore, are not properly regulated by Congress pursuant to its authority "[t]o regulate Commerce . . . among the several States . . . ." Art. I, § 8, cl. 3.

In this regard, the Court disagrees with *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir.1995) and *U.S. v. Wilson*, 73 F.3d 675 (7th Cir. 1995), which reject this argument on the grounds that it finds no support in Commerce Clause precedent. *See Cheffer*, 55 F.3d at 1520 & n. 6; *Wilson*, 73 F.3d at 684–85. By so doing those decisions ignore the Supreme Court's instruction that Congress'

authority to regulate activities that substantially affect interstate commerce is limited to the regulation of commercial or economic activities that substantially affect interstate commerce. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1630–31. Both *Cheffer* and *Wilson* mistakenly rely on statutes that regulate activity which Congress could reasonably characterize as economic or commercial because the activity regulated by those statutes relates to commercial transactions or activities that have an apparent economic motive. These statutes, however, cannot support the conclusion in *Cheffer* and *Wilson* that Congress can regulate noncommercial or noneconomic activities consistent with *Lopez*. *See Cheffer*, 55 F.3d at 1520 & n. 6; *Wilson*, 73 F.3d at 684–85.

 Even if Congress can regulate, consistent with *Lopez*, non-commercial or non-economic activity that substantially affects interstate commerce, however, the Court finds that Congress exceeded its authority under Art. I, § 8, cl. 3, when it enacted FACE. Even the most cursory examination of Congress' findings shows that they are plainly insufficient to support a reasonable inference that the protest activity regulated by the statute has a substantial effect upon interstate commerce. The Senate Report, which contains the best findings offered in support of the legislation, relies almost exclusively on anecdotal evidence concerning the effect of anti-abortion protest upon commerce. The only quantitative evidence concerning these protests states that there have been a total of 7,000 incidents where protestors have interfered with abortion-related commerce between 1977 and 1993. But this figure supports a mere showing that, on average, there has been approximately 8 incidents per year, per state, in which abortion protestors have interfered with abortion-related commerce. And there is really no significantly probative evidence showing the degree, if any, to which these activities have actually reduced abortion-related commerce. The Senate Report seeks to buttress the lack of evidence concerning the effects of these protest activities on interstate commerce by offering the conclusion that abortion protests have resulted in millions of dollars in property damage, millions of dollars in law enforce-

ment costs, and have also caused some clinics providing abortions to be closed. *See* S.Rep. No. 103–117, 103rd Cong., 1st Sess. 5, 7, 31 (1993). These assertions are based on the incidents described in the committee reports, but again, there is absolutely no evidence concerning the actual or probable affects that these protest activities have on interstate commerce.[6]

In fact, none of the legislative materials provide any evidence which supports a reasonable inference that the regulated activities have a *substantial* effect upon interstate commerce. So, rather than muster the (nonexistent) congressional findings, the Attorney General repeatedly equates the interference that *local* protest might have upon *local* abortion-related commerce with a burden upon, or interference with, *interstate* commerce. In so doing, she relies heavily on those Commerce Clause cases which emphasize that the development of our national economy makes it most difficult to conclude that any given economic activity is truly "local" commerce in a narrow sense.

But the same process that has obliterated the barriers to national commerce and thereby created a truly national economy also accounts for the tremendous volume and value of that interstate commerce. Therefore, if it is difficult to conclude that any commerce is purely local then, by the same token, it is similarly difficult to conclude that any given activity has a truly substantial effect on interstate commerce. So even if one accepted the bare assertion that the protest activity regulated by FACE in the 1977–93 period created millions of dollars in property damage and closed some clinics that perform abortions (and the only evidence is that such closure was temporary), it clearly does not follow that the regulated activities have a *substantial* effect upon interstate commerce. Quite the contrary, it is evident

that the activity Congress seeks to regulate in this case has—at most—an imperceptible effect on interstate commerce if only because during that same period interstate commerce, in the same broad sense urged by the Attorney General, has dwarfed the relatively insignificant sums that can be reasonably inferred from Congress' findings.[7]

Under these circumstances, it is not surprising that the Attorney General has been unable to point to any congressional findings that would support a reasonable inference that the protest activities regulated by FACE has a *substantial* affect upon interstate commerce. Just this sort of modest inquiry concerning the effect that the activities regulated by Congress have on interstate commerce is essential precisely because "the question of congressional power under the Commerce Clause is necessarily one of degree." *Lopez,* — U.S. at —, 115 S.Ct. at 1633 (citations and quotations omitted). As the Supreme Court explained:

> There is a view of causation that would obliterate the distinction of what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours is an elastic medium which transmits all tremors throughout its territory; *the only question is of their size.*

*Id.* (emphasis added, citations and quotations omitted). Because this view of causation is tenable in the abstract but inconsistent with the federal structure underlying the Constitution and its enumeration of powers, the Supreme Court has long recognized that the Constitution requires Congress' authority under Art I. § 8, cl. 3, be limited to the regulation of activity that *substantially* affects *interstate* commerce so that the Commerce Clause does not become the basis for a feder-

---

6. The assertion regarding the costs of law enforcement activities is truly odd for law enforcement costs are not commerce no matter how broadly one might define that term. *See Lopez,* — U.S. at —–—, 115 S.Ct. at 1630–31. More importantly, the Commerce Clause must be interpreted in light of its goal, to protect our national marketplace from barriers to interstate commerce, and therefore, only activity obstructing commerce—which is not the case with re-

spect to conduct increasing law enforcement-related expenditures—is relevant to the Commerce Clause inquiry.

7. During the same 1977–1993 period, for example, Gross Domestic Product has totaled approximately $61,244,600,000,000. *See* Statistical Abstract of the United States, Section 14, No. 699, 115th Ed. (1995).

al police power that would eviscerate the limited government secured by the enumeration of federal powers. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1633–34. Thus, when the Fifth Circuit noted that Congress can only regulate activity that substantially affects interstate commerce under Art. I, § 8, cl. 3, it explained:

> Indeed, it could not be otherwise as the chain of causation is virtually infinite, and hence there is no private activity, no matter how local and insignificant, the ripple effect from which is not in some theoretical measure ultimately felt beyond the borders of the state in which it took place. Hence, if the reach of the commerce power to local activity that merely affects interstate commerce or its regulation is not understood as being limited by some concept such as 'substantially' affects, then, contrary to *Gibbons v. Ogden,* the scope of the Commerce Clause would be unlimited, it would extend " 'to every description' of commerce and there would be no 'exclusively internal commerce of a state' the existence of which the Commerce Clause itself 'presupposes' and the regulation of which it 'reserved for the state itself.' "

*U.S. v. Lopez,* 2 F.3d 1342, 1362 (5th Cir. 1993), *aff'd* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).[8] In this case, even when Congress is given all due deference, its extremely limited findings are plainly insufficient to support a reasonable inference that the protest activities regulated by FACE substantially affect interstate commerce. At best, the congressional findings serve to establish a trivial or merely incidental impact that these protest activities have on interstate commerce, and "the Court has never declared that 'Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities.' " *Lopez,* —— U.S. at ——, 115

S.Ct. at 1630 (quoting *Maryland v. Wirtz,* 392 U.S. 183, 196 n. 2, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968).).

The congressional findings cited in this case are little more than conclusions almost identical to the arguments offered by the government in *Lopez* to justify Congress' authority to enact the Gun–Free School Zones Act. Indeed this case bears a striking resemblance to *Lopez* precisely because it is necessary to pile inference upon inference in order to accept the Attorney General's argument that Congress' findings support a reasonable inference that the protest activity regulated by FACE has a substantial effect upon interstate commerce. If the findings and assertions relied upon by Congress and the Attorney General in this case pass constitutional muster, then Congress can regulate any activity under Art. I, § 8, cl. 3, so long as it bothers to make any findings of record at all. In fact, the Attorney General's effort to distinguish *Lopez* is unpersuasive because if Congress can regulate any activity that burdens abortion-related commerce, without a reasonable showing that such conduct substantially affects interstate commerce, then Congress can regulate any activity. *See Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1632–34.[9]

For these reasons, this Court cannot agree with *Cheffer v. Reno,* 55 F.3d 1517 (11th Cir.1995) or *U.S. v. Wilson,* 73 F.3d 675 (7th Cir.1995), which hold that Congress had authority to enact FACE because the statute regulates activities that substantially affect interstate commerce. The opinions are not persuasive because they contain no meaningful judicial review of Congress' findings, but rely on findings which show that the protest activities regulated by FACE have some relatively trivial effect on interstate commerce to satisfy the requirement that the regulated activities have a substantial effect upon inter-

---

**8.** The ripple metaphor apparently references a pebble thrown in a tranquil pond, and the lesson of *Lopez,* when put in these terms, is that a given pebble (or human activity) must be fairly substantial before it can have a substantial affect upon the large and tumultuous pond that is our national marketplace.

**9.** For example, if the Attorney General's argument were accepted, Congress could prohibit double-parking outside of abortion clinics, strike down laws restricting the hours during which supplies could be delivered to abortion clinics or the hours of their operation, and further, Congress could regulate any number of noncommercial activities that obstruct commerce such as trespass and shoplifting on the theory that such activities burden commerce.

state commerce. By eschewing any meaningful judicial inquiry concerning the degree to which the protest activity regulated by FACE affects interstate commerce these opinions ignore the Supreme Court's instruction that "the question of congressional power under the Commerce Clause is necessarily one of degree." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1633 (citations and quotations omitted).

■ The Court realizes that judicial review of congressional action in this area is highly deferential, and that Congress need not act with scientific precision or make exhaustive findings when it decides to legislate in a given area. But it is also true that in *Lopez, supra*, the Supreme Court affirmed the traditional duty of Article III courts to determine whether a congressional enactment exceeds the scope of the commerce power and demonstrated that deferential judicial review cannot be equated with judicial obsequience. *See Lopez*, —— U.S. at —— & n. 2, ——, 115 S.Ct. at 1629 & n. 2, 1631; *see also* opinion of Kennedy, J. concurring, —— U.S. at —— & ——, 115 S.Ct. at 1637 & 1639; opinion of Thomas, J. concurring, —— U.S. at —— n. 9, 115 S.Ct. at 1650 n. 9. In this Court's view, *Lopez* illustrates that when Congress enacts a statute that regulates activity pursuant to its authority under Art. I, § 8, cl. 3, the existence of congressional findings to support the legislative judgment that the regulated activity substantially affects interstate commerce becomes especially important where, as here, no such substantial ef-

fect on interstate commerce is evident and where, as here, the arguments offered in support of congressional authority would, if accepted, transform the commerce power into a general police power. *See Lopez*, —— U.S. at ——, 115 S.Ct. at 1634; *see also* opinion of Kennedy, J. concurring, —— U.S. at —— & ——, 115 S.Ct. at 1640 & 1642; opinion of Thomas, J. concurring, —— U.S. at ——, —— – ——, 115 S.Ct. at 1642, 1649–50. As noted earlier, Congress made no such findings when it enacted FACE.

■ Further, the statute is also void because FACE does not contain any jurisdictional element that limits its reach to activity that has an explicit connection with, or effect on, interstate commerce. *See Lopez*, —— U.S. at ——, 115 S.Ct. at 1631.[10] So even if this Court were satisfied that Congress rationally concluded that the activity of the protestors was within the scope of its authority under Art. I, § 8, cl. 3, and substantially affected interstate commerce, the statute is void because it fails to contain a jurisdictional element which would ensure, through a case-by-case inquiry, that the statute only reached those activities that have the requisite connection with, or effect upon, interstate commerce. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631. As *Lopez* plainly indicates, where a federal statute regulates activity that has a substantial effect on interstate commerce, a jurisdictional element must "limit its reach to a discrete set of ... [regulated activities] that additionally have an explicit connection with or effect on interstate commerce." *Id.*[11]

---

10. The issue in *Lopez*, as framed by the Supreme Court, was whether the activity regulated by 18 U.S.C. § 922(q) could be upheld under Congress' authority to regulate activity that substantially affected interstate commerce. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1630. After the Court concluded that § 922(q) could not be upheld because it did not regulate a commercial activity which, when viewed in the aggregate, substantially affected interstate commerce, *id.* at ——, 115 S.Ct. at 1630–31, it also found that Congress had exceeded its commerce power when it enacted the Gun–Free School Zones Act because the statute lacked any jurisdictional element that would ensure, through a case-by-case inquiry, that the statute's reach was limited to that discrete part of the regulated activity that had an explicit connection with or effect on interstate commerce. *Id.* Thus, *Lopez* indicates that where Congress can properly regulate activity on the

theory that such activity substantially affects interstate commerce, then the statute must contain a jurisdictional element that limits the reach of the statute to those activities that have an explicit connection with or effect upon interstate commerce, *id.*, such that they come within the scope of Congress' commerce power.

11. Thus, although the Attorney General correctly notes that "[w]here the class of activities is regulated and that class is within reach of federal power, the courts have no power 'to excise as trivial, individual instances' of the class ..." *Perez v. U.S.*, 402 at 154, 91 S.Ct. at 1361 (citations omitted). The Attorney General ignores the prior question treated in *Lopez, supra*, which indicates that a class of noneconomic activities is only within the reach of commerce power when it has an explicit connection with or effect on interstate commerce.

Absent such a jurisdictional element, a federal statute that properly reaches activity that substantially affects interstate commerce will also reach activity that has no such connection with interstate commerce, and therefore, is not properly within the scope of Congress' authority pursuant to Art. I. § 8, cl. 3. As the Supreme Court recognized in *Lopez,* such a result would transform Congress' authority to "regulate Commerce ... among the several States ..." U.S. Const., Art. I. § 8, cl. 3, into a federal police power—a result forbidden by the Constitution. *See Lopez,* —— U.S. at ——, —— – ——, 115 S.Ct. at 1631, 1633–34.[12]

The absence of a jurisdictional element that would limit the operation of FACE to "a discrete set of ... [protest activities] that additionally have an explicit connection with or effect on interstate commerce ..." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631, is another reason why this Court cannot agree with the decisions in *Cheffer* and *Wilson,* supra. Those Courts ignore the holding in *Lopez,* that 18 U.S.C. § 922(q)(1)(A) was void because it did not have a jurisdictional element "which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect upon interstate commerce." *Id.* Likewise, the Attorney General's reliance on various cases she cites is misplaced precisely because they either involve the regulation of commercial activity or statutes that have such a jurisdictional element linking the offense to interstate commerce.

Similarly, this Court also cannot accept the Attorney General's argument that FACE is a valid exercise of Congress' authority to "protect ... persons or things *in interstate commerce.*" *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (emphasis supplied). The statute is not focused, by its terms, on efforts to obstruct individuals from moving between states to secure or provide abortions. Rather, the statute regulates protest in the immediate vicinity of abortion clinics that may impede abortion-related traffic. So the Attorney General's argument is not persuasive.

Indeed, as the Court has already noted, a similar argument was made and rejected in *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), where the Supreme Court observed that purely intrastate restrictions do not implicate the right of interstate travel, *id.* at 274–75, 113 S.Ct. at 762–63, and the Seventh Circuit has properly rejected this argument, albeit *in dicta. See Wilson,* 73 F.3d at 686–87.

Nor can this Court accept the Attorney General's argument that FACE is a valid exercise of Congress' authority to "protect ... things *in interstate commerce.*" *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (emphasis supplied). The statute does not target the obstruction of interstate traffic in goods. And this Court cannot agree with the Seventh Circuit's reasoning, *in dicta,* that Congress could enact FACE pursuant to its authority to protect the movement of things in interstate commerce, *see Wilson,* 73 F.3d at 686–88. The Court believes that the Seventh Circuit's conclusion rests upon a misreading of *Lopez,* for when the Supreme Court held that § 922(q) did not fit within the second category of activity that Congress could regulate pursuant to Art I. § 8, cl. 3, it clearly indicated that Congress' authority over activities in that second category derived from its authority to protect *instrumentalities* of interstate commerce or things *in interstate commerce. Lopez,* —— U.S. at ——, 115 S.Ct. at 1630 ("nor can § 922(q) be justified as a regulation by which Congress sought to protect an instrumentality of interstate commerce or a thing in interstate commerce."). In fact, the statute relied on by the Seventh Circuit for its broad reading of congressional authority to protect persons and things in interstate commerce does not support the Seventh Circuit's position; that provision concerns "... goods or chattels moving as or which are part of or which constitute an interstate or foreign shipment ..." 18 U.S.C. § 659. Thus the statute plainly relates to the movement of things in interstate com-

---

**12.** For this reason, the Seventh Circuit properly recognized that Congress could not rest its authority to enact FACE on a finding that the problem caused by abortion protests was nation-al in scope because, if it could, then Congress would have the equivalent of a federal police power. *See Wilson,* 73 F.3d at 683.

merce and the protection of instrumentalities of interstate commerce, i.e. the storage facilities, stations, stationhouses, platforms and depots noted by the Court. *See Wilson,* 73 F.3d at 687–88.

Again it could not be otherwise because if Congress' authority in this area is cut loose from its moorings—the regulation of instrumentalities of interstate commerce—then Congress can regulate any activity, see e.g. note 9 *supra.,* quite apart from whether that activity substantially affects interstate commerce; and for this same reason, no doubt, the Seventh Circuit properly rejected the Attorney General's argument that Congress had authority to protect persons in interstate commerce independent of Congress' authority to regulate the instrumentalities of interstate commerce. *Wilson,* 73 F.3d at 687. Finally, this broad reading of *Lopez* is also untenable because, as the Seventh Circuit recognized, it would require the Court to revive some sort of distinction between direct and indirect regulations of commerce, an approach that proved unworkable and was abandoned by the Supreme Court long ago. *See Wilson,* 73 F.3d at 688 (*citing N.L.R.B. v. Jones & Laughlin Steel, Inc.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937)). In short, the reasoning and result in *Lopez,* clearly indicate that the Attorney General's argument must be rejected.

Thus, Congress exceeded its power under Art. I., § 8, cl. 3, when it enacted a statute regulating protest activities which are not properly regulated by Congress pursuant to its authority "[t]o regulate Commerce ... among the several States...." Art. I, § 8, cl. 3, because they are neither commerce or economic enterprise however broadly one might define those terms. Congress also exceeded its power under Art I, § 8, cl. 3, when it sought to regulate the Plaintiffs' protest activities without making legislative findings that provide a rational basis for its conclusion that those activities regulated by the statute substantially affect interstate commerce. Finally, Congress violated the Constitution when it used its authority "[t]o regulate Commerce ... among the several States ..." Art I, § 8, cl. 3, U.S. Const., to enact a statute that did not include a jurisdic-

tional element which would ensure, through a case-by-case inquiry, that the statute only reached those activities that have an explicit connection with, or effect on, interstate commerce such that they come within the scope of the commerce power. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. Therefore, this Court finds that the current version of FACE is void.

But neither Congress nor the Attorney General need be alarmed. As *Lopez* indicates, under modern Commerce Clause jurisprudence Congress has enacted a wide variety of laws pursuant to its authority under Art. I, § 8, cl. 3, of the Constitution and the vast majority of those laws have been upheld precisely because the constitutional limits upon congressional power are modest and easily satisfied. Nothing in this decision, or in *Lopez,* implicates the wide range of activities that Congress has regulated via its commerce power and can still regulate consistent with *Lopez.*

(b) *Congressional authority to enact FACE pursuant to the Fourteenth Amendment.*

■ Turning to Congress' reliance on the Fourteenth Amendment, Section 1 of the Fourteenth Amendment provides:

**Amendment XIV.**

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No *State* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any *State* deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. (Emphasis added).

It would appear from the plain language of the Fourteenth Amendment that it applies only to State action. However, lawyers being the innovative characters they are have attempted in several cases to have the courts support their argument that the Fourteenth Amendment reaches private conduct. Even though some former justices of the Supreme

Court have expressed the view that it might, the Supreme Court has never ruled that way.

One of the more recent cases reiterating the Supreme Court's holding is *Sherman v. Community Consol. School District 21,* 8 F.3d 1160 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2109, 128 L.Ed.2d 669;

"[The Fourteenth] Amendment erects no shield against merely private conduct, however discriminatory or wrongful." (citations omitted).

*Id.* at 1168. The Court pointed out that there were exceptions—a symbiotic relationship between a private actor and the State, an involvement of government authority, the state had commanded or encouraged the private discriminatory action by affirmatively supporting the private conduct challenged, or in private discriminatory action when the private actor carries on a traditional state function. Those persons who engage in picketing, leafletting and protesting against abortion cannot under any stretch of the imagination be considered to be acting under the auspices of any State and certainly not pursuant to the laws of any State. Their conduct is purely private conduct and is not subject to the provisions of the Fourteenth Amendment.

(c) *First Amendment Challenges to FACE.*

As noted, the Plaintiffs also allege that FACE violates their First Amendment right to peacefully protest abortion and they have advanced a number of specific arguments in support of this claim. According to the Plaintiffs, the legislative history, statutory text, and operation of FACE show that it is a content- and view-point based restriction that violates the First Amendment because its purpose and effect is to restrain only anti-abortion protestors. They also argue that the statute is a content-based restriction violative of the First Amendment because it depends for its operation on the reaction of listeners to the speech of abortion protestors. In addition, the Plaintiffs argue that the statute is vague such that it violates the First Amendment because (1) the terms "force or threat of force" as used in § 248(a) might include a non-violent "sit-in", threatening someone or calling them a murderer, or warning someone that they may go to hell; (2) the term "physical obstruction" as defined in § 248(e)(4), might include requiring someone to walk through a picket line, walk around a persistent sidewalk counselor, step over people engaged in a "sit-in" or praying on the sidewalk, or wait twenty minutes while police arrest participants in a rescue blockade; (3) the term "bodily injury" as used in § 248(b) seems to include any emotional distress that might result from encountering abortion protestors and might include any medical complications arising from such an encounter; (4) the term "intimidates" defined by § 248(e)(3) to include a reasonable apprehension of bodily harm may include the emotional distress or medical complications noted above, and also, may be satisfied if an abortion provider believes that the delay or distress caused by encountering abortion protestors may threaten a woman who needs an abortion for health reasons; (5) the term "interfere with" as defined by § 248(e)(2) to include "restrict[ing] a person's freedom of movement" may include the interference which accompanies circumventing those who kneel in prayer outside abortion clinics, crossing a picket line, or standing in someone's way to talk with them; and, (6) the statute is vague because its prohibition of "intimidation" depends on the subjective reaction of listeners to the speech of abortion protestors. In addition, the Plaintiffs claim that the statute is overbroad because, by its terms, it includes the obstruction or interference that is incidental to the exercise of their right to protest abortion by picketing, sidewalk counseling, and prayer, activities that are properly protected under the First Amendment; and it prohibits threatening language that is neither "fighting words" nor an "imminent threat of lawless action" such that this threatening language is still protected by the First Amendment.

The Attorney General has not responded to these arguments. Instead, she notes that while this case was pending, the Fourth Circuit rendered its decision in *American Life League, supra.* According to the Attorney General, that intervening decision disposes of the Plaintiffs' First Amendment claims.

This Court agrees with the Attorney General in part. In fact, this Court stayed this case pending the Fourth Circuit's decision in *American Life League,* just so it would have the benefit of that intervening decision, and that decision does govern the resolution of several of the Plaintiffs' claims. More specifically, this Court believes that the Plaintiffs' claim that FACE violates the First Amendment because its purpose and effect is to limit the free speech of anti-abortion protestors because of their viewpoint must be rejected in light of the Fourth Circuit's decision. *See American Life League,* 47 F.3d at 648–51. The same is true of the Plaintiffs' claim that the statute's prohibition of physical obstruction is overbroad because it reaches the obstruction incidental to protected speech, *id.* at 652–53, and their claim that the statutory prohibition of "interfering with" or rendering access to "unreasonably difficult" is vague or overbroad. *Id.* at 653.

■ However, this Court cannot agree with the Attorney General's assertion that the Fourth Circuit's decision disposes of the Plaintiffs' claims *in toto.* Implicitly, the Attorney General argues that when the Fourth Circuit resolved the First Amendment challenges brought in *American Life League, supra,* it resolved at once and for all time any possible First Amendment challenge that might be levied against the statute. This Court cannot agree because Article III limits the jurisdiction of federal courts to cases and controversies that are properly before the Court. Thus, federal courts do not review statutes in the abstract, vetting them for possible constitutional defects not raised by the parties to the case. Rather federal courts must and do limit themselves to the arguments properly raised by the parties. And it is evident that the Fourth Circuit's opinion only treats those issues raised in that case.

After reviewing the trial court record and appellate briefing and opinion in *American Life League, supra,* it is clear that the Fourth Circuit's opinion in that case does not dispose of several of the challenges raised by the Plaintiffs here. More specifically, nothing in the Fourth Circuit's opinion addresses the arguments made by the Plaintiffs in this case that the statute is a content-based restriction violative of the First Amendment because it depends for its operation on the reaction of listeners to the speech of abortion protestors. Nor does that opinion address their arguments that the statute is vague such that it violates the First Amendment because (1) the terms "force or threat of force" as used in § 248(a) might include a non-violent "sit-in", threatening someone or calling them a murderer, or warning someone that they may go to hell; (2) the term "bodily injury" as used in § 248(b) seems to include any emotional distress that might result from encountering abortion protestors and might include any medical complications arising from such an encounter; (3) the term "intimidates" defined by § 248(e)(3) to include a reasonable apprehension of bodily harm may include the emotional distress or medical complications noted above, and also, may be satisfied if an abortion provider believes that the delay or distress caused by encountering abortion protestors may threaten a woman who needs an abortion for health reasons; (4) the prohibition of "intimidation" depends on the subjective reaction of listeners to the speech of abortion protestors. Similarly, the opinion does not address the Plaintiffs' argument that the statute is overbroad because it includes threatening language that is neither "fighting words" nor an "imminent threat of lawless action" such that this threatening language is still protected by the First Amendment.

*Level of Scrutiny.*

■ Having determined that some of the Plaintiffs' First Amendment challenges are not governed by the Fourth Circuit's prior decision in *American Life League,* the Court must determine the level of scrutiny that should be applied when reviewing FACE. The Plaintiffs have argued that heightened scrutiny is appropriate, and there is good reason to agree. As noted above, Congress specifically enacted FACE to deal with anti-abortion protestors, it does not deal with *all* protest activities outside of clinics providing abortions. In fact, the Senate Report itself makes this clear when it describes the impact of the statute:

Thus, for example, if an environmental group blocked passage to a hospital where abortions happen to be performed, but did so as part of a demonstration over harmful emissions produced by the facility, the demonstrators would not violate this Act (though their conduct might violate some other law, such as a local trespass law). In that example, the demonstrators' motive is related to the facility's emissions policy and practices and not to its policy and practices on abortion-related services. The Committee has concluded that inclusion of the motive elements is important to ensure that the Act is precisely targeted at the conduct that, as the Committee's record demonstrates, requires new Federal legislation; deliberate efforts to interfere with the delivery of abortion-related services.

*See* S.Rep. No. 103–117, 103rd Cong., 1st Sess. 24 (1993). As the Senate Report emphasizes, FACE is designed to regulate the protest activities of only those protestors who are motivated by abortion, not individuals who may undertake the exact same conduct outside an abortion clinic for reasons not related to abortion.

Under these circumstances, it seems certain that FACE requires the heightened scrutiny applied by the Supreme Court in *Madsen v. Women's Health Center Inc.,* —— U.S. ——, ——, 114 S.Ct. 2516, 2525, 129 L.Ed.2d 593 (1994), because FACE, like the content-neutral restriction at issue in *Madsen,* is not a generally applicable law, and therefore presents a distinct risk of censorship and discrimination. *Madsen,* —— U.S. at ——, 114 S.Ct. at 2516. For as the Supreme Court noted in *Madsen:* "[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." *Id.* (brackets in the original, citation omitted). FACE circumvents that practical guarantee against unreasonable government, and therefore this Court is confident that the statute should be reviewed under the "more stringent" standard governing content-neutral restrictions on speech that are not generally applicable. See *Madsen,* —— U.S. at ——–——, 114

S.Ct. at 2524–25. But the Fourth Circuit concluded otherwise in *American Life League,* supra, and this Court is bound by that decision.

▪ Even under this deferential standard, however, several of the Plaintiffs' unopposed arguments are persuasive. First, by its plain terms FACE prohibits speech that is "intimidating" to someone because it creates a "reasonable apprehension of bodily harm to him-' or herself or another", see 18 U.S.C. § 248(e)(3), such that the application of the statute hinges on the subjective reaction that speech elicits from its listener and is therefore unconstitutional. *See e.g. Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 133, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992); *Texas v. Johnson,* 491 U.S. at 412, 109 S.Ct. at 2544; *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988). Also, by prohibiting speech because it creates a "reasonable apprehension of bodily harm to him- or herself or another", see 18 U.S.C. § 248(e)(3), it reaches beyond the restriction of "fighting words" nor "imminent threats of lawless action" that is permitted by the First Amendment so that the statute is overbroad and therefore unconstitutional. *See City of Houston v. Hill,* 482 U.S. 451, 461–62, 107 S.Ct. 2502, 2509–10, 96 L.Ed.2d 398 (1987); *Gooding v. Wilson,* 405 U.S. 518, 524, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972); *NAACP v. Claiborne Hardware,* 458 U.S. 886, 927, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982); *Brandenburg v. Ohio,* 395 U.S. 444, 449, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430 (1969); *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971); *Cohen v. California,* 403 U.S. 15, 18–23, 91 S.Ct. 1780, 1784–87, 29 L.Ed.2d 284 (1971); *Watts v. U.S.,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) *(per curiam );* *Wurtz v. Risley,* 719 F.2d 1438, 1439–42 & n. 2 (9th Cir.1983). Further, the Court finds that the statute is overbroad insofar as it allows individuals to sue for threats that allege harm to the speaker (such as a hunger strike) or allows third-parties to sue based upon their apprehension that speech threatens bodily harm to another; the Attorney General has mustered no case where such a

statute has been found to satisfy the First Amendment, and the Court believes that this provision plainly reaches speech that cannot be regulated consistent with the Constitution. *Cf. Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1969). For these reasons, the Court finds that FACE violates the First Amendment such that the enforcement of these provisions must be enjoined.

### NOW, THEREFORE, IT IS ORDERED:

1. The Motion by the Plaintiffs, filed December 6, 1993 (document # 1), for Declaratory Judgment declaring N.C.G.S. § 14–277.4 to be invalid and unconstitutional on its face is *GRANTED.*

2. The Motion by the Plaintiffs that Defendants be restrained from enforcing or threatening to enforce N.C.G.S. § 14–277.4 is *GRANTED.*

3. The Motion by Defendants James B. Hunt and the State of North Carolina to abstain from exercising any jurisdiction over this matter (document # 11) is *DENIED.*

4. The Motion by Defendants Hunt and the State of North Carolina to Dismiss and for Summary Judgment (document # 61) is *DENIED.*

5. The Motion by United States of America to Dismiss claim as to 18 U.S.C. § 248 (document # 72) is *DENIED.*

6. The Motion by Plaintiffs for Judgment declaring FACE, 18 U.S.C. § 248, unconstitutional (document # 76) is *GRANTED.*

7. Plaintiffs' prayer for Permanent Injunction enjoining enforcement of N.C.G.S. § 14–277.4 and 18 U.S.C. § 248 is *GRANTED.*

**IT IS FURTHER ORDERED** that the Clerk shall certify a copy of this Amended Memorandum of Decision and Order and a copy of the Amended Judgment to the counsel for the parties. The Clerk shall make the Amended Order and Judgment a part of the record on appeal from this Court's Judgment in lieu of the Order and Judgment filed April 1, 1996.